UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SALIK RAO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 04 C 6040 |
| | ) |
| BP PRODUCTS NORTH AMERICA, INC., | ) Judge Joan B. Gottschall |
| AMOCO, INC., Mr. STEVE YARR, PAIGE | ) |
| THOMASON (A/K/A PAIGE SCHUMACHER), | ) Magistrate Judge Denlow |
| BRAD SCHUMACHER, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Salik Rao ("Rao") has sued BP Products North America, Inc. ("BP") for, among other things, violations of the Petroleum Marketing Practices Act ("PMPA") and breach of contract.[1] Rao has moved for a preliminary injunction to prevent BP from terminating his leases for two gas stations during the pendency of this litigation. Magistrate Judge Morton Denlow held a four-day hearing on the motion and has issued a Report and Recommendation ("R&R") recommending that the preliminary injunction be denied. After a careful review of the R&R, the briefs filed in support of and in objection to it, and the transcript of the preliminary injunction hearing before Judge Denlow, the court adopts the Magistrate Judge's findings of fact, and (with minor modifications

---

[1] In addition to his PMPA and breach of contract claims, Rao's complaint alleged causes of action against BP and certain of its employees for violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act and for common law fraud. The latter claims were brought against BP, BP employees Steve Yarr ("Yarr") and Paige Thomason ("Thomason"), as well as Thomason's husband, Steve Schumacher ("Schumacher"). The court granted the defendants' motions to dismiss the RICO and fraud claims but let stand Rao's PMPA and breach of contract claims, which are the only causes of action relevant to the present motion.

1

noted below) the conclusions of law set forth therein. The court therefore overrules the objections to the R&R and denies Rao's motion for a preliminary injunction.

## BACKGROUND

**A.     Facts**

For several years, Rao has been the owner and/or operator of a number of gasoline stations in the Northern Illinois region. In addition to his BP stations, Rao also has owned and/or operated stations for Shell, Mobil, and Marathon. Rao alleges that since the early 1990s, he has been the victim of threats and extortion by a number of BP employees, particularly Steve Yarr, a BP regional area manager whose territory included Illinois, Wisconsin, and Indiana.[2]

In the summer of 2003, Rao approached BP's internal investigation department to report the extortionate and corrupt practices to which he allegedly had been subjected. Ronald Benhart, a BP Regional Security Advisor, conducted an investigation into Rao's claims, which eventually led to an FBI undercover sting operation in which Rao participated and which resulted in Yarr's arrest. In his statement to the FBI, Yarr admitted wrongdoing and implicated a number of others, including Rao, in misconduct.[3] BP conducted an investigation into Yarr's relationship with Rao and concluded that Rao had engaged in bribery and fraud.

In July of 2004, BP notified Rao of its intention to terminate his leases at the Franklin Park

---

[2] The details of the alleged pattern of extortion are set forth in the court's ruling on the defendants' motion to dismiss and will not be rehearsed here.

[3] Rao disputes the Magistrate Judge's finding that Yarr's statement to the FBI implicated Rao in wrongdoing. Pl.'s Obj., at 15. Rao's objection is mistaken. Yarr unequivocally states that Rao (and Kahn) expected Yarr's assistance in purchasing and selling a number of BP stations at favorable prices in exchange for his gifts and payments to Yarr. *See, e.g.*, FD-302 Report of Interview of Stephen J. Yarr in November 2003, at 3 (Ex. W of Pl.'s Prelim. Injunc. Hearing Exhibits).

and Morton Grove Stations, and instructed Rao to vacate the premises. Rao refused to leave,[4] and in early June of 2005, BP stopped delivering gas to Rao at the Morton Grove Station. Rao then began posting signs on his gas pumps accusing BP of price-gouging and corruption. Rao claims that BP's decision was a retaliatory measure designed to punish him for cooperating with the FBI and exposing BP's misconduct.

**B.      Procedural History**

Rao filed his complaint on September 16, 2004. On February 17, 2005, Rao asked the court to issue a Temporary Restraining Order ("TRO") or preliminary injunction enjoining BP from terminating his leases and closing the Morton Grove and Franklin Park Stations. The court granted the TRO and scheduled a preliminary injunction hearing. By agreement of the parties, the TRO subsequently was extended until May 2, 2005. On May 12, the Magistrate Judge recommended that Rao's preliminary injunction request be denied because Rao had failed to notify the court that he wished to proceed with the hearing and because Rao had failed to file a $200,000 bond as security for the TRO. The Magistrate Judge's order further stated that Rao had acted in bad faith by claiming that he had posted the bond when he had not in fact done so. On May 16, 2005, Rao again moved for a preliminary injunction. The Magistrate Judge denied the motion, finding the lack of emergency circumstances, and referred the matter back to this court.

On June 6, Rao filed a third motion for a preliminary injunction. From June 27 to June 30, 2005, the Magistrate Judge presided over a hearing on the motion. Four witnesses testified at the hearing: Rao; his cousin and brother-in-law, Ateeq Kahn ("Kahn"); Ronald Benhart; and Michael LaBeau ("LaBeau"), BP's Manager of Dealer Operations for U.S. Convenience Operations. On

---

[4] As of the date of the Magistrate Judge's R&R, Rao still had not vacated the stations.

August 10, 2005, the Magistrate Judge issued an R&R recommending that Rao's motion for a preliminary injunction be denied and that Rao be required to vacate the Morton Grove and Franklin Park Stations immediately. Rao timely filed objections to the R&R.

**DISCUSSION**

**I.    LEGAL STANDARD**

Under Fed. R. Civ. P. 72(b), the district court is required to conduct a *de novo* determination of those portions of the magistrate judge's report and recommendations to which specific written objections have been filed. *See, e.g.*, *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995). Making a *de novo* determination, however, does not entail a *de novo hearing*, even if some issues turn on the credibility of witnesses. *See, e.g.*, *M & D Balloons, Inc. v. Courtaulds*, No. 90 C 834, 1990 WL 186077, at *2 (N.D. Ill. Nov. 1, 1990) (citing *United States v. Raddatz,* 447 U.S. 667, 674 (1980)). Rather, the district court has the discretion to accept, reject, modify, in whole or in part, the findings or recommendations made by the magistrate. *Goffman*, 59 F.3d at 671. Although a court may not simply "rubber stamp" the magistrate's conclusions, "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on the magistrate's proposed findings and recommendations." *M & D Balloons*, 1990 WL 186077, at *2 (internal quotations omitted). Hence, the district court may "give to the magistrate's proposed findings of fact and recommendations 'such weight as [their] merit commands and the sound discretion of the judge warrants.'" *Raddatz*, 447 U.S. at 683 (citing *Mathews v. Weber*, 423 U.S. 261, 275 (1976)); *see also M & D Balloons*, 1990 WL 186077, at *2.

One challenge initially posed by Rao's objections is that of determining those parts of the R&R to which he has properly objected. Rao at one point purports to take "issue with and object[]

to the entirety" of the R&R. Pl.'s Obj., at 7. Yet Rao also identifies a number of other, more specific findings and conclusions that he believes are incorrect. Rao's individual objections are specific enough to comply with Fed. R. Civ. P. 72(b). Nevertheless, they are set forth in such a haphazard fashion and cover such varied parts of the R&R that it is easiest for the court simply to review the entire R&R *de novo*.

## II. THE FRANKLIN PARK STATION

Section 2805(b)(2) of the PMPA specifically provides for the possibility of preliminary injunctive relief in cases arising under the Act. Indeed, § 2805 sets forth a special standard to be used in determining whether a preliminary injunction should issue. The PMPA preliminary injunction standard, moreover, is easier to satisfy than the traditional standard under Fed. R. Civ. P. 65. *See, e.g.*, *Strasheim v. Amoco Oil Co.*, 659 F. Supp. 687, 691 (N.D. Ill. 1987) ("Congress relaxed the normal preliminary injunction standard in ... the PMPA."); *Greco v. Mobil Oil Corp.*, 597 F. Supp. 468, 472 (N.D. Ill. 1984) (same). Under the PMPA, a court must grant a preliminary injunction if:

> (A) the franchisee shows--
> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C.A. § 2805 (b)(2)(A)(i)-(ii). The franchisee has the burden of proving the termination or nonrenewal of the franchise; the franchisor then has the burden of showing as an affirmative defense

that the termination or nonrenewal was permissible under the PMPA. 15 U.S.C.A. § 2805(c).

The parties do not dispute that Rao had a franchise relationship with BP for the Franklin Park Station and that the PMPA applies to their agreement for that property. The parties also agree that the relationship has been terminated. The Magistrate Judge concluded that there were no sufficiently serious questions going to the merits providing fair grounds for litigation, and that the balance of hardships weighed in BP's favor.

### A. Existence of Questions Providing a Fair Ground for Litigation

#### 1. Grounds for Termination

In the letter BP sent to Rao explaining its decision to terminate his Franklin Park lease, BP argued that its action was justified under two provisions of the PMPA: first, § 2802(b)(2)(A), which allows for termination when a franchisee fails to comply with a provision of the franchise that is both reasonable and of material significance to the franchise relationship, 15 U.S.C. § 2802(b)(2)(A); and second, § 2802(b)(2)(C), which allows for termination based upon the occurrence of "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(C).

The Magistrate Judge found that Rao had engaged in fraud and bribery. Having reviewed the transcript of the preliminary injunction hearing, and taking into account the Magistrate Judge's ability to observe Rao's demeanor and that of the other witnesses, the court accepts this finding as its own. As an initial matter, the court agrees with the Magistrate Judge's general finding that Rao was not a credible witness, based not on demeanor but on the implausibility of some of his testimony. Like the Magistrate Judge, the court has difficulty believing Rao's claim that he never

6

read the contracts and agreements at issue in the case. Tr. 370:12-371:1; R&R, at 2. The court also finds unconvincing Rao's testimony that he did not read the sworn affidavit, dated February 14, 2005, which he signed and submitted to the court. Tr. 354:8-23.

The court also agrees with the Magistrate Judge's finding that Rao had engaged in various forms of improper conduct and that Rao was not merely a victim of extortion. For example, the court finds that Rao failed to provide a plausible explanation as to why, if Rao indeed had been a victim of Yarr's extortion for several years, he would have encouraged his cousin, Ateeq Kahn, to enter into business with Yarr, and why Rao would have waited for over ten years before bringing Yarr's conduct to light. Also persuasive in the court's view is evidence that Rao on several occasions refused to accede to a number of Yarr's requests and the fact that Rao's behavior was similar to that of other dealers who had bribed Yarr. *See, e.g.*, Tr. 164:15-19; 205:9-206:11; 408:10-18. Moreover, the fact that Rao may have been a victim of Yarr's extortion in no way precludes a finding that Rao also was engaged in bribing Yarr. *See, e.g.*, *United States v. Lisinski,* 728 F.2d 887, 892 (7th Cir. 1984) ("Bribery and extortion are not mutually exclusive."); *City of Chicago Heights v. Lobue*, No. 92-7410, 1995 WL 290389, at *4 (N.D. Ill. May 10, 1995) ("[C]laims of bribery against the payor of bribes and claims of extortion against the receiver of bribes relating to a common transactions are, at least in some instances, not mutually exclusive."). BP is as injured by dealers who give in to extortionate demands by its employees as it is by employees who willingly accept bribes from dealers. The moral status of the participant may vary, but BP's interests are similarly undermined.

Because Rao had engaged in fraud and bribery, the court concludes that BP's termination of the Franklin Park franchise was justified under both of the PMPA provisions cited in BP's

7

termination letter. First, Rao's conduct clearly constituted "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable," thus permitting termination pursuant to § 2802(b)(2)(C). Indeed, a neighboring subsection of the PMPA specifically provides that "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises" qualifies as an event for which termination is reasonable under § 2802(b)(2)(C). *See* 15 U.S.C. § 2802(c)(1).

Rao's conduct clearly meets the definition of fraud and criminal misconduct. First, as the Magistrate Judge concluded, Rao's activity amounted to commercial bribery under Illinois law, which is committed when a person "confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." 720 ILCS 5/29A-1.

The Magistrate Judge also concluded that Rao engaged in fraud by, *inter alia*, artificially inflating the sale price for one of Rao's gas stations in order to discourage BP from exercising its right of first refusal to purchase the station, s*ee* R&R, at 24, and by taking on Paige Thomason, a BP area representative, as a silent partner. R&R, at 9. As Illinois courts have noted, fraud "in its general sense includes any act, omission, or concealment calculated to deceive, including silence, if accompanied by deceptive conduct or suppression of material facts constituting an act of concealment." *State Sec. Ins. Co. v. Frank B. Hall & Co.*, 630 N.E.2d 940, 943 (Ill. App. Ct. 1994). Under Illinois law, fraud consists of five elements: (1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance. *Id*. Rao's conduct satisfies all of these elements and

8

thus amounts to fraud under Illinois law.[5]

Similarly, Rao's fraudulent activity constituted a failure to comply with a reasonable and materially significant provision of the franchise, thus justifying termination under § 2802(b)(2)(A). Specifically, paragraph 19(b) of the franchise agreement provides for termination upon "[c]ommission by Dealer or any of Dealer's employees or agents of any deceptive, fraudulent, illegal, immoral, or other improper act relevant to the operation of the business on the Facility which is detrimental to Lessor or to any member of the public." This provision is eminently reasonable and material. Indeed, it largely reiterates the PMPA's own provisions allowing for termination due to fraud. *See also Baker v. Amoco Oil Co.*, 761 F. Supp. 1386, 1396 (E.D. Wis. 1991) (franchisor was justified under PMPA in terminating franchisee who violated dealer supply agreement provision forbidding misrepresentation in pump meter readings); *cf. Mikeron, Inc. v. Exxon Co., U.S.A.*, 264 F. Supp. 2d 268, 277 (D. Md. 2003) (franchisor did not violate PMPA in light of "considerable evidence" that plaintiff breached provisions of franchise agreement).

Paragraph 19(b) of the franchise agreement also is of material significance to the franchise relationship. In remarking upon § 2802(b)(2)(A), the Seventh Circuit stated that the "materiality requirement ... reflects the congressional concern that termination or nonrenewal might be based on technical or minor violations of the contract." *See Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1222 (7th Cir. 1982) (internal quotation omitted). A provision is material if the parties included it in the franchise agreement "in good faith" and "in the normal course of business." *Baker*, 761 F. Supp.

---

[5] It is true that Rao has not been convicted or even charged with fraud or criminal misconduct, but Rao has not argued that a formal criminal charge or conviction is necessary for a termination to be reasonable under § 2802(c)(1); nor has the court found any authority for such a proposition.

at 1396 (citing *Brach*, 677 F.2d at 1222). Paragraph 19(b) is not technical in nature. On the contrary, it is difficult to conceive of a more important provision than one forbidding fraud and deceptive acts. For the same reasons, there is no reason to suspect that the provision's inclusion in the agreement lacked good faith or was somehow outside of the normal course of business. Because paragraph 19(b) is both reasonable and material, BP did not violate the PMPA in terminating Rao for his failure to comply with the provision.

### 2. The PMPA's Notice Provisions

The Magistrate Judge rejected two additional arguments Rao advanced with respect to the Franklin Park Station. First, Rao claimed that even if BP had legitimate grounds for terminating Rao under the PMPA, BP nonetheless violated the Act by failing to provide Rao with the notice required when franchisors seek to terminate a lease due to a franchisee's misconduct. Specifically, the PMPA requires franchisors to give franchisees notice of termination within 120 days from the point at which the franchisor first acquires actual or constructive knowledge of the franchisee's breach or misconduct prior to terminating a franchise agreement. 15 U.S.C. § 2802(b)(2)(A)(i), & (b)(2)(C)(i). Rao contends that BP was fully aware of Rao's alleged misconduct by November 30, 2003 but did not terminate Rao until July 14, 2004. Since a period of 226 days had elapsed, Rao claims that BP's notice was not timely.

The court agrees with the Magistrate Judge in rejecting this argument. The PMPA was not intended to induce franchisors to terminate franchises "summarily upon the first suspicion of wrongdoing." *Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1056 (6th Cir. 1994). On the contrary, such an "interpretation of section 2802 would induce termination based on rumor or suspicion, and thus undermine the protection from arbitrary and discriminatory terminations that Congress intended."

*Id.* (internal quotations omitted); *see also Nassau Blvd. Shell Service Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 362-63 (2d Cir. 1989) ("Mere suspicions . . . do not provide a franchisor with a basis for termination despite section 2802's contemplation of 'constructive knowledge'.... We believe that [the franchisor] took the proper course by trying to confirm its suspicions before effecting a termination.").

Rao insists that BP was not justified in waiting to terminate Rao since BP failed to conduct any further investigation into Rao's wrongdoing after November of 2003. BP replies that its investigation did in fact continue after that time and that it concluded only in June of 2004 – roughly a month before it terminated Rao's agreements – when it learned that Rao had ceased cooperating with the investigation. Both parties cite to Benhart's testimony in support of their positions. During examination by plaintiff's counsel, for example, Benhart testified as follows:

> Q: So, then, it's a fair statement to say that by November of '03, up until about six months ago [at which point Rao had already been terminated], there was no additional data received by AMOCO with regard to allegations about Salik Rao, correct?
> A: Most of the investigative information came from within those periods that I've described.
> Q: Which would have been August of '03 to November of '03, correct?
> A: Yes.
> Q: And within the past six months?
> A: Yes.
> Q: Can you think of any other information you received in the interim time?
> A: In other components of the investigation there was a number of areas we were exploring, but in regard to Mr. Rao that's primary [sic] the areas.
> Q: You can't think of anything else pertaining to Mr. Rao outside of those time periods, correct?
> A: Off the top of my head, no.

Tr. 187:13 - 188:6.

Under examination by counsel for BP, however, Benhart's testified as follows:

> Q: Mr. Goode made a point that after November 2003 you didn't gather any

11

>       new evidence with respect to Mr. Rao. Do you remember that testimony?
> A:    Yes, I do.
> Q:    Did you continue your investigation of Mr. Rao after November 2003?
> A:    Yes.
> Q:    Did you continue to seek evidence after November 2003?
> A:    I did.
> Q:    Did you continue to contact Mr. Rao in an attempt to set up further interviews with him after November of 2003?
> A:    Yes.
> Q:    And in response to those attempts to set up further interviews with Mr. Rao, what did Mr. Rao at least tell you?
> A:    That he would meet with us.
> Q:    And did he do that?
> A:    No.
> Q:    Did there come a time when you determined that Mr. Rao would no longer be helpful in your investigation?
> A:    Yes.
> Q:    And when was that determination made?
> A:    His attorneys called and said, basically, that he wanted copies of our investigation to help him in lawsuits against other parties, and I referred him to our attorneys.
> Q:    Okay. And per that request did you have any understanding as to Mr. Rao's continuing willingness to cooperate with you?
> A:    I was informed subsequently that I was no longer to contact Mr. Rao.
> Q:    Because he had threatened litigation?
> A:    Yes.
> Q:    And do you remember approximately when that was?
> A:    Near the same time that he refused to meet with us.
> Q:    And that was approximately when?
> A:    I think it was June 2004.

Tr. 224:14 - 226:4.

The court finds that any tension in Benhart's statements is merely apparent: the essence of his testimony is that BP's investigation of Rao continued until June 2004. BP may have not gathered new evidence after November 2003; but from that it does not follow that the investigation had ceased. Rather, Benhart's testimony indicates that the investigation ended only when it concluded that BP would receive no further assistance from Rao. The court finds that BP was

12

reasonable in waiting until June 2004 to conclude its investigation. Hence, the court concludes that BP complied with the PMPA's notice requirements.

### 3. The Place of the Misconduct

Next, Rao claims that his termination was impermissible under the PMPA because his fraudulent conduct is not alleged to have taken place at the Franklin Park Station itself. For the reasons adduced by the Magistrate Judge, Rao's argument fails. Rao provides no authority for the proposition that a franchisee's misconduct must occur on the premises of the station in question. Rather, by its express terms, the PMPA requires only that the breach of contract be "reasonable and of material significance to the franchise relationship," 15 U.S.C § 2802(b)(2)(A), or that the breach of contract be "relevant to the franchise relationship," 15 U.S.C § 2802(b)(2)(C). Moreover, § 2802(c)(1) – which elaborates on the grounds justifying dismissal under § 2802(b)(2)(C) – lists fraud or criminal misconduct by the franchisee that is "relevant" to the operation of the marketing premises. 15 U.S.C § 2802(c)(1). The court has little difficulty in concluding that Rao's fraud and bribery were relevant to the franchise relationship at Franklin Park and constituted a breach of a reasonable and material term of the Franklin Park franchise agreement. As the Magistrate Judge found, Rao's bribes were part of an attempt to obtain benefits and advantages for all of his stations, including those in Franklin Park and Morton Grove.

### B. Balance of Hardships

The Magistrate Judge also went on to conclude that the balance of hardships favored BP, not Rao. However, the PMPA requires a court to grant a preliminary injunction only if it has found *both* the existence of questions providing a fair ground for litigation *and* that the balance of hardships favors the franchisee. Since the Magistrate Judge concluded – and the court agrees – that there are

no questions providing a fair ground for litigation, it is unnecessary to consider the balance of hardships. *See, e.g.*, *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 61 (2d Cir. 1984) (since the court found no serious questions on the merits where plaintiff was engaged in misbranding gasoline, plaintiff was not entitled to a preliminary injunction regardless of relative hardships); *ABJO Motors, Inc. v. Shell Oil Co.*, 856 F. Supp. 656, 658 (S.D. Fla. 1994) (court did not balance hardships where it had found the lack of any serious grounds for litigation); *Black v. Exxon Co., U.S.A.*, 746 F. Supp. 615, 617 (D.S.C. 1990) (same).

The court concludes that Rao's termination was permissible under the PMPA and that, as a result, no questions exist providing a fair ground for litigation with respect to the Franklin Park Station. Rao's request for a preliminary injunction with respect to the Franklin Park Station is denied.

### III. THE MORTON GROVE STATION

While the parties agree that the PMPA applies to the Franklin Park Station, they fiercely dispute whether the Act applies to the Morton Grove Station. According to BP, the PMPA protects only franchisees. Although at one time Rao was a franchisee with respect to the Franklin Park Station, he relinquished that status in signing the CMA for the station in 1998. BP further argues that the Morton Grove Agreement disclaims any rights under the PMPA. Specifically, paragraph 26 of the agreement states:

> MARKETER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT DOES NOT CREATE, EXTEND OR RENEW A FRANCHISE UNDER ANY LOCAL, STATE OR FEDERAL LAW, INCLUDING BUT NOT LIMITED TO THE FEDERAL PETROLEUM MARKETING PRACTICES ACT.

Rao contends that, notwithstanding paragraph 26, the Morton Grove Station is protected by

14

the PMPA. First, he argues that he did not read the agreement before executing it; next, he claims that the agreement is a contract of adhesion; and third, he argues that paragraph 26 does not in fact revoke any of his rights under the PMPA.

The court need not address these arguments or settle the issue of whether the PMPA applies to the Morton Grove Station, since Rao would not be entitled to injunctive relief for the Morton Grove Station irrespective of whether it is covered by the PMPA.[6] On the one hand, if the PMPA *does* apply, Rao's claim fails because it would be subject to an analysis identical to that undertaken with respect to the Franklin Park Station. Rao's termination at Morton Grove was based on the same rationale as the Franklin Park termination (viz., Rao's bribery and fraud). Having concluded that Rao's conduct warranted termination with respect to the Franklin Park Station, the same conclusion follows vis a vis the Morton Grove Station.

On the other hand, if the Morton Grove Station is *not* subject to the PMPA and Rao is left with only a breach of contract claim, the claim still fails. Indeed, since the PMPA's preliminary injunction standard is easier to meet than the traditional standard, Rao's inability to meet the former standard essentially ensures his inability to succeed under the latter. Under the traditional standard, a plaintiff seeking a preliminary injunction bears the burden of showing: "(1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895

---

[6] For the same reason, the court need not address Rao's objections concerning the Magistrate Judge's findings with respect to the relative advantages of commission marketer agreements versus company owned dealer operated ("CODO") agreements. *See* R&R, at 4-6; Pl.'s Obj, at 9. Nor need the court take up Rao's cryptic assertion that in "the case at bar Rao raises for the first time, the issue of whether or not the conversion from PMPA to CMA is a ruse to avoid the intent of Congress in creating the PMPA." Pl.'s Obj., at 10.

(7th Cir. 2001).

The court concludes that Rao has little if any chance of success on the merits. Rao's agreement with BP for the Morton Grove Station contains a provision that is identical in substance to PMPA § 2802(c), which allows for termination in cases of "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises." 15 U.S.C. § 2802(c)(1). Specifically, section 23(B)(3) of the Morton Grove CMA provides that BP may terminate the agreement immediately for, *inter alia*, "[f]raud or criminal misconduct by the Marketer or Marketer's employees relevant to the operation of the Facility." *See* BP's Mem. Supp. Mot. to Dismiss, Ex. 2. Just as Rao's fraud and bribery warranted termination under the PMPA, his conduct similarly warrants termination under the CMA.[7]

---

[7] Having so concluded, the court need not address the remaining preliminary injunction factors. *See, e.g.*, *Ferrell v. U.S. Dept. of Housing and Urban Development*, 186 F.3d 805, 814 (7th Cir. 1999) ("Because we hold that the plaintiffs have no likelihood of success on the merits, we need not review the district court's findings regarding irreparable harm or the absence of an adequate remedy at law."); *Eveready Battery Co., Inc. v. Adolph Coors Co.*, 765 F. Supp. 440, 452 n.25 (N.D. Ill. 1991) ("[A] preliminary injunction may not be granted where the court finds no likelihood of success on the merits. Logically, if a plaintiff has no likelihood of prevailing at trial, the issues of irreparable harm, balancing of threatened injury, and disservice of public interest are rendered moot."). Nevertheless, consideration of the additional factors would be of little help to Rao, particularly under the "sliding scale" analysis courts employ under *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002) (stating that "the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor"). The Magistrate Judge correctly concluded that Rao could not demonstrate irreparable injury since, in the absence of an injunction, Rao would suffer only monetary damages, which could be fully recovered if he were to prevail at trial. R&R, at 33. The fact that Rao's damages are cognizable in monetary terms also undermines his ability to show that he has no adequate remedy at law. Finally, the court agrees with the Magistrate Judge's opinion that, given Rao's other business ventures (e.g., his interest in other gas stations and his part ownership of a coffee supply company), termination of the Morton Grove and Franklin Park agreements will not leave him destitute. *See* R&R, at 2.

16

Because the court concludes that Rao's claim – whether it is viewed as arising under the PMPA or as a garden variety contract cause of action – is not likely to succeed on the merits, Rao is not entitled to a preliminary injunction with respect to the Morton Grove Station.

## IV. ADDITIONAL ISSUES

Finally, the court addresses a motley number of other issues raised throughout Rao's objections. In many instances, these objections ultimately amount to disagreements with the Magistrate Judge's credibility determinations: essentially, Rao accuses the R&R of ignoring evidence that the Magistrate Judge simply found unconvincing. Furthermore, many of these miscellaneous objections are redundant and are of peripheral importance at best. Nonetheless, the court addresses these remaining contentions for the sake of completeness.

First, Rao claims that BP terminated his agreements for both the Franklin Park and Morton Grove Stations in retaliation for Rao's cooperation with the FBI. Doing so, Rao asserts, violated the PMPA and constituted a breach of contract. The Magistrate Judge found that BP, not Rao, initiated contact with the FBI and that Rao's retaliation claims consequently were untenable. The court agrees.

In addition, Rao claims that the Magistrate Judge ignored evidence that BP had attempted to "cheat Rao and Kahn out of their Lockport[, Illinois] Station." Pl.'s Obj., at 7-8. Apparently, Rao's argument is that the Magistrate Judge was unfair in emphasizing Rao's unclean hands while turning a blind eye to BP's unclear hands. But evidence of Rao's wrongdoing is not (or not simply) a matter of unclean hands; rather, it relates to the statutory and contractual authority according to which BP was permitted to terminate its relationships with Rao. Even if evidence of BP's misconduct existed, it would be no relevance to the question whether Rao's termination was

17

permissible.

Rao also argues that the R&R "ignores the testimony of Rao, the reports of the FBI, statements by Yarr, and the fact that it was Rao who went to BP security, Rao who wore a wire to show Yarr was extorting dealers, and that in Yarr's statement to the FBI Yarr admitted extorting many other dealers." Pl.'s Obj., at 11 (citations omitted). The court disagrees. The Magistrate Judge took account of all of the testimony to which Rao refers; the Magistrate Judge simply concluded – correctly – that none of the statements in question made Rao's termination improper.

Rao additionally takes issue with the R&R's treatment of Rao's switch from a franchise agreement to a CMA for the Morton Grove Station. For example, Rao claims that the Magistrate Judge incorrectly found that BP dealers were not given rights to other BP stations if they agreed to convert PMPA agreements to CMAs. Pl.'s Obj., at 11. Rao claims that Rao received his rights to two BP stations in the downtown area in accordance with this program, not as a result of bribery or misconduct. Evidence of Rao's misconduct with respect to the downtown stations, however, is only a small part of a much larger picture. The Magistrate Judge found – and the court agrees – that Rao's improper payments to Yarr spanned a period of several years and were an attempt to influence decisions with respect to all of Rao's BP stations. Even if the court were to accept Rao's contention that he obtained the downtown stations pursuant to a legitimate BP policy, such a conclusion would do little to show that BP was unjustified in terminating Rao for other improprieties.

Rao argues that BP's investigation into Rao's conduct was flawed because it did not result in a written report. Pl.'s Obj., at 7-8, 11-15. The central question, however, is not whether the investigators' findings were reduced to writing, but rather whether their inquiries furnished BP with sufficient evidence to warrant Rao's termination. The court reiterates that, taking all of the evidence

18

into account, BP possessed sufficient information regarding Rao's wrongdoing to justify its decision to terminate his agreements.

Finally, Rao claims that the Magistrate Judge wrongfully refused to allow Rao to call Lisa Freeman ("Freeman") as a witness at the preliminary injunction hearing. Pl.'s Obj., at 3.[8] Although Rao does not explain who Freeman is – she apparently is member of BP's in-house legal department – Rao claims that her testimony would have revealed that "she told Rao, and attorney Goode, that if he brought his attorney to any BP Amoco meeting then in that event BP Amoco would terminate his leases." Pl.'s Obj. at 3. Rao cites no place in the record indicating his attempt to call Freeman as a witness, nor any place indicating the Magistrate Judge's refusal to allow Freeman to appear. Nor again does Rao point to any place in the record indicating his objection to the fact that Freeman would not be allowed to appear. Freeman's name did appear on a list of potential witnesses prior to the hearing; and BP did object to Freeman's appearance (as well as that of other witnesses). But the Magistrate Judge denied BP's motion, and indeed all of the other motions *in limine*, without prejudice. Hence, there is no reason to think that Rao in fact was prevented from calling Freeman as a witness.

## CONCLUSION

---

[8] It is unclear whether Rao intends his allegations regarding Lisa Freeman to serve as the basis for an objection to the R&R. Rao does not mention Freeman in the argument portion of his brief but instead refers to her alleged exclusion only in his rendition of the facts.

For the foregoing reasons, Rao's motion for a preliminary injunction is denied.

ENTER:

/s/_____

JOAN B. GOTTSCHALL
United States District Judge

Dated: March 9, 2006