# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SALIK RAO,                                              )
                                                        )
                 Plaintiff,                          )
                                                        )
                 v.                                  )     Case No. 04 C 6040
                                                        )
BP PRODUCTS NORTH AMERICA, INC.,                        )     Judge Joan B. Gottschall
AMOCO, INC., Mr. STEVE YARR, PAIGE                      )
THOMASON (A/K/A PAIGE SCHUMACHER),                      )     Magistrate Judge Denlow
BRAD SCHUMACHER,                                        )
                                                        )
                 Defendants.                         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Salik Rao ("Rao") has sued BP Products North America, Inc. ("BP"),[1] along with

BP employees Steve Yarr ("Yarr") and Paige Thomason ("Thomason"), and Thomason's husband,

Steve Schumacher ("Schumacher"),[2] for violations of the Racketeer Influenced and Corrupt

Organizations Act (RICO) and for common law fraud. Rao has also sued BP for violation of the

Petroleum Marketing Practices Act (PMPA) and for breach of contract. Each of the claims is

premised upon Rao's allegation that the defendants were engaged in a scheme of extortion against

him. All of the defendants have moved to dismiss the complaint pursuant to Fed. R. Civ. P.

---

[1] Rao's complaint also lists Amoco as a defendant and sometimes refers to BP as "BP-Amoco." BP and Amoco merged in 1998 and Amoco no longer exists as a freestanding entity. In what follows, the court will refer only to BP.

[2] Schumacher is not a BP employee.

12(b)(6).[3] For the reasons set forth below, Yarr's motion to dismiss is granted; Thomason and Schumacher's motion to dismiss is granted; and BP's motion to dismiss is granted in part and denied in part.

## FACTUAL BACKGROUND

Over a period of several years, Rao has owned and/or operated a number of BP gasoline stations in the Northern Illinois region, including Wilmette, Morton Grove, Franklin Park, and downtown Chicago. Yarr was a BP regional area manager whose territory included Illinois, Wisconsin, and Indiana. Thomason was a BP retail account executive. Both Yarr's and Thomason's jobs involved acting as liaisons between BP and the operators of its gas stations and retail stores. Rao alleges that, over a period of several years, Yarr, Thomason, and a number of other BP officials and employees subjected him to extortion. Among other things, Rao claims that he was threatened with the loss of his leases and franchise operations unless he acceded to a wide array of demands by the defendants. Although not set forth in an organized, coherent fashion in the complaint, the facts alleged, which the court assumes to be true for the purposes of this motion, are as follows:

### A. The Wilmette Station

In 1997, Rao approached BP with an offer to purchase a BP gas station located in Wilmette, Illinois. Yarr and Thomason reviewed the offer, as did several other BP employees not named as defendants in the suit. Yarr told Rao that his offer for the station would be rejected unless Rao agreed to accept Thomason as a silent partner. Because Thomason's employment with BP formally

---

[3] Although a total of three different motions to dismiss were filed – one by BP, one by Yarr, and one by Thomason and Schumacher – Rao filed only two separate responses – one to BP's motion (hereinafter "Resp. to BP") and another to Yarr's and Thomason and Schumacher's motions (hereinafter "Resp. to Yarr").

prevented her from owning any stations, Thomason's interest in the property was put in the name of her husband, Brad Schumacher. Rao was told that if he refused to go along with the scheme, he would lose all of his other BP stations. According to Rao, he reluctantly agreed.

In 2001, after Thomason had left BP, Yarr and Thomason informed Rao that Thomason had obtained approval from BP to purchase Rao's share of the Wilmette Station. Rao was told that if he refused, and if he did not also agree to pay Yarr $10,000, Rao would lose his other BP franchises. Rao also claims that he was forced to sell his interest in the station at a price below its true value. Again, Rao claims that he reluctantly agreed.

## B. The Morton Grove Station

In 1998, Rao was a dealer franchisee of a BP gas station in Morton Grove, Illinois. Franchisees are afforded a number of benefits and protections under the Petroleum Marketing Practices Act (PMPA). 15 U.S.C. § 2801, *et seq*. Rao alleges that Yarr (and another BP employee not named as a defendant) attempted to strip him of these protections by forcing and deceiving him into signing a Commission Marketer Agreement (CMA) for the station. Yarr told Rao that Rao would be better off under the CMA, that Rao could return to being a franchisee at a later time if he wished, and that in agreeing to the CMA, Rao would not lose the PMPA's protections. When Rao asked whether he could speak with his attorney before making the decision, Yarr replied that if Rao failed to execute the CMA immediately, BP would raise the rents on all of Rao's other stations and would drive him out of business.

## C. The Downtown Stations

In October of 1998, Rao was operating two gas stations in downtown Chicago. Although Rao had invested $160,000 in the businesses and had ten years remaining on his leases, Yarr

informed Rao in October of 2000 that BP planned to close the stations and sell them to a land developer.[4] He also told Rao that he had to vacate the premises within sixty days. In December of 2000, Yarr told Rao that Rao could purchase the two properties, but only if he agreed to take on Yarr as a silent partner. If Rao refused, Yarr threatened to terminate all of Rao's leases at other stations. In December 2000 or January 2001, Rao purchased the two properties at a price of over $3 million. Rao's purchases were made on the condition that neither property would be used as a gas station – a proviso intended to benefit one of Yarr's associates who operated competing gas stations in the downtown area.

### D.    The Franklin Park Station

In the summer of 2003, Rao approached BP's internal investigation department to inform them of the extortionate and corrupt practices to which he had been subjected. Although he was initially ignored, a BP security officer eventually joined Rao at a meeting with the FBI in October and November of 2003. Yarr eventually was arrested by the FBI. Rao alleges that BP attempted to terminate his leases for the Morton Grove and Franklin Park Stations after it learned of Rao's relationship with Yarr. Rao also claims that BP employees later told him that he could remain a BP franchise holder if he kept silent about his dealings with Yarr, Thomason, and Schumacher. If he continued to seek the FBI's help, however, he was told that his franchises would be terminated.

### E.    Other Allegations

In addition to all of the acts and events described above, Rao makes a number of other, miscellaneous allegations. He claims, for example, that Yarr demanded from him gifts of cash in

---

[4] As discussed more fully below, the year of the alleged incident's occurrence is a matter of controversy.

excess of $50,000, as well as computer equipment and home appliances. Yarr told Rao that if he refused to furnish the gifts, he would be falsely cited for violations of his franchise agreements with BP, which in turn would lead BP to cancel or refrain from renewing the agreements. Rao also claims that Terry Bunch, whom Rao identifies as a BP Vice President (but does not name as a defendant), forced Rao to provide gifts for Bunch's girlfriend, threatening that if Rao refused, Bunch would terminate Rao's leases.

## F.    Procedural History

Rao filed his complaint on September 16, 2004. On February 17, 2005, Rao asked the court to issue a Temporary Restraining Order (TRO) or preliminary injunction enjoining BP from terminating his leases and closing the Morton Grove and Franklin Park Stations. The court granted the TRO and scheduled a preliminary injunction hearing. From June 27 to June 30, 2005, Magistrate Judge Morton Denlow presided over the hearing on Rao's preliminary injunction motion. On August 10, 2005, Judge Denlow issued a Report and Recommendation.[5] Meanwhile, all of the defendants have filed motions to dismiss Rao's complaint.

## G.    The Complaint

Rao's complaint consists of five counts. Count I, which is brought against all of the defendants, alleges that the defendants' extortionate conduct violated various provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq*. Count II alleges common law fraud against all of the defendants. Count III purports to be a claim for

---

[5] Judge Denlow recommended that Rao's motion for a preliminary injunction be denied and that Rao be required to vacate the Morton Grove and Franklin Park Stations immediately. The court does not rely upon the Magistrate's findings of fact or conclusions of law in deciding the present motion.

"coercion and extortion" under Illinois law. Since Illinois law recognizes no such cause of action, the court dismissed Count III pursuant to a minute order entered on August 4, 2005. Count IV, which is brought only against BP, alleges violations of the Petroleum Marketing Practices Act. Finally, Count V, which also is alleged solely against BP, claims breach of contract.

## JURISDICTION

Rao's complaint asserts that the court has jurisdiction over the case pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331. As noted, Rao asserts a number of state law causes of action in addition to those arising under federal law. Although Rao's complaint asserts no basis for the court's jurisdiction over the state law claims, he presumably wishes to invoke the court's supplemental jurisdiction pursuant to 28 U.S.C § 1367. The fact that Rao does not expressly invoke the court's supplemental jurisdiction does not prevent the court from exercising jurisdiction over the state law claims. *See, e.g.*, *Toro v. Gainer*, 370 F. Supp. 2d 736, 741 (N.D. Ill. 2005) (plaintiff stated a claim under Illinois law even though he did not invoke supplemental jurisdiction by citing 28 U.S.C. § 1367); *Moore v. Miller*, No. 96 C 1347, 1997 WL 269595, at *8 (N.D. Ill. May 12, 1997).

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, a complaint will be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Ledford v. Sullivan*, 105 F.3d 354, 357 (7th Cir. 1997). Courts must treat all well-pleaded factual allegations in the complaint as true and must also draw all reasonable inferences from those allegations in the plaintiff's favor. *MCM Partners, Inc. v. Andrews-Bartlett & Assoc.*, 62 F.3d 967, 972 (7th Cir. 1995). Courts need not, however, "strain to find inferences favorable to the plaintiffs which are not apparent on the face of the complaint." *Coates v. Illinois*

*State Bd. of Ed.*, 559 F.2d 445, 447 (7th Cir. 1977). Nor are they required to ignore facts set forth

in a complaint or exhibits that undermine a plaintiff's claim, *Hamilton v. O'Leary*, 976 F.2d 341, 343

(7th Cir. 1992), much less to accept legal conclusions alleged by or inferred from the pleaded facts.

*Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1559 (7th Cir. 1991).

## I.      CIVIL RICO CLAIMS (COUNT I)

In Count I, Rao alleges that all of the defendants violated three different provisions of the

RICO statute: §1962(a), which makes it unlawful to invest money derived from a pattern of

racketeering activity or through the collection of an unlawful debt in an enterprise; §1962(c), which

makes it unlawful for any person employed by or associated with any enterprise to conduct the

enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt; and

§1962(d), which makes it unlawful for any person to conspire to violate subsections (a), (b), or (c)

of §1962.

The defendants urge dismissal on two grounds. First, Yarr argues that Rao's RICO claims

are time-barred. Second, all of the defendants contend that Rao's RICO claims are insufficiently

pled.

### A.      Statute of Limitations

The court first considers Yarr's argument that Rao's RICO claims are barred by the statute

of limitations. Although the RICO statute itself does not contain a statute of limitations, the

Supreme Court, analogizing RICO to the Clayton Act, has fixed the limitations period at four years.

*See, e.g.*, *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 152-53 (1987).

Since Rao filed suit on September 16, 2004, his RICO claim is barred if it accrued prior to

September 16, 2000.

There is some disagreement among circuit courts as to the point at which a RICO cause of action accrues. In *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187 (1997), the Court rejected the so-called "last predicate act" rule, under which the four-year statute of limitations would begin to run from the point at which the plaintiff knew or should have known of the last injury or the last predicate act that is part of the same pattern of racketeering activity. *See also McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464 (7th Cir. 1992). And in *Rotella v. Wood*, 528 U.S. 549, 553-55 (2000), the Court held that the statute of limitations' starting point could not be determined by the so-called "injury and pattern discovery rule," according to which the RICO limitations period does not begin to run until the plaintiff discovers, or should have discovered, both the injury and the pattern of racketeering activity.

Beyond these holdings, the circuits have developed slightly different rules for determining when a RICO cause of action accrues. In the Seventh Circuit, the limitations period begins to run once there is a RICO violation and the plaintiff knew or should have known that he was injured. *McCool*, 972 F.2d at 1464. Under *McCool*, in other words, although a RICO claim accrues only after a defendant has engaged in a pattern of racketeering activity, the plaintiff need not be *aware* of the pattern. Rather, the plaintiff need only be aware that he or she has been injured by the defendant's wrongful conduct. Importantly, however, *McCool* also adopted a "separate accrual" rule for civil RICO claims, under which a new RICO cause of action accrues when there is a new instance of wrongful conduct and a new injury, and suit to recover for that injury must be brought within the limitations period. *Id.* at 1465 n.10.

Under *McCool*, Rao's RICO claim accrued once there had been a RICO violation (i.e., a

pattern of racketeering activity and a resulting injury) and Rao was aware that he had been injured. Based on the complaint's allegations, Rao's claim accrued in 1998, at the very latest.[6]  In that year, Rao claims that he was forced to enter into the CMA for the Morton Grove Station.  Taken together with the extortion surrounding the purchase of the Wilmette Station in 1997, the events relating to the Morton Grove Station constitute a pattern of racketeering activity.  Given the nature of his allegations, moreover, Rao should immediately have been aware of the resulting injury.

It follows that Rao cannot recover for injuries relating to the purchase of the Wilmette Station in 1997.  It also follows that he may not recover for injuries relating to his change of status from franchisee to commission marketer for the Morton Grove Station  in 1998.  Because Rao's complaint fails to provide dates for many other events, it is impossible to determine whether other injuries may fall outside the limitations period.

Rao maintains that the accrual date for his RICO claims should be postponed under the doctrine of equitable tolling.  This argument is without merit.  Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital

---

[6] Yarr argues that Rao, in an affidavit submitted to the court on May 16, 2005 in connection with his preliminary injunction motion, averred that Yarr's extortionate conduct began in 1993.  *See* May 16, 2005, Aff. 1, ¶ 4.  Citing *Feigl v. Ecolab, Inc.*, 280 F. Supp. 2d 846, 848 (N.D. Ill. 2003), Yarr argues that the court may consider the affidavit without converting Rao's motion to dismiss into a motion for summary judgment.  The court disagrees.  *Feigl* holds only that documents attached to a motion to dismiss are considered to be part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.  While Yarr is correct in pointing out that Rao's complaint "makes reference to the same facts stated in his affidavit,"Yarr Mot. to Dismiss, at 5 n.3, the complaint does not actually refer to *the affidavit*. *See Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947) ("In passing on a motion to dismiss because the complaint fails to state a cause of action, the facts set forth in the complaint are assumed to be true and affidavits and other evidence produced on application for a preliminary injunction may not be considered.").  For present purposes, therefore, the court confines itself to the dates and events alleged in the complaint.

information bearing on the existence of his claim." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). The doctrine applies where the plaintiff knows that he has been injured but lacks the information necessary to determine whether the injury has resulted from wrongdoing and, more particularly, resulted from the defendant's wrongdoing. *Id*. Given the nature of the acts Rao has alleged, he cannot claim ignorance about whether his alleged injuries were the result of wrongdoing or about who was responsible for the wrongdoing.

Rao also argues that claims related to pre-2000 events are saved by virtue of the "continuing violation" or "continuing wrong" doctrine. A "continuing wrong" occurs when a defendant's initial wrongful act is not a separate and completed wrong in itself, but instead marks the first step in an ongoing course of wrongful conduct. *In re Gaslight Club, Inc.*, 167 B.R. 507, 520 (Bnkr. N.D. Ill. 1994). The doctrine applies when, because a single event gives rise to continuing injuries, it would be unreasonable to require a plaintiff to sue separately over every incident of the defendant's unlawful conduct. *See Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001). Rao argues that all of the defendants' extortionate acts constitute a single, ongoing wrong that has resulted in ongoing injuries.

The court disagrees. As noted in the very authorities upon which Rao relies, the continuing wrong theory is inapplicable when "the harm is definite and discoverable and where nothing prevented the plaintiff from coming forward and seeking redress at an earlier time." *In re Gaslight*, 167 B.R. at 520. Rather, "the continuing violation doctrine is designed to attack a series of acts whose character only becomes apparent when viewed in light of later acts." *Id*. With respect to the extortion surrounding his purchase of the Wilmette Station in 1997, Rao does not allege that he became aware of the harm only in retrospect, or that it would have been unreasonable for him to sue

at the time because the harm was not yet complete. Instead, Rao claims that he was unable to bring suit in 1997 because he was threatened with the loss of his livelihood. The continuing violation doctrine is inapposite here.

While the court holds that the statute of limitations bars recovery for injuries connected with the purchase of the Wilmette Station in 1997 and the signing of the CMA for the Morton Grove Station in 1998, the court holds that injuries stemming from events after September 2000 are *not* time-barred. Specifically, Rao's allegation that he was forced to sell the Wilmette Station at a "false price," which took place in 2001, and his allegations with respect to the downtown stations, which occurred in December of 2000 or January of 2001,[7] are not foreclosed by the statute of limitations. Each of these incidents involves a new instance of wrongful conduct and an injury separate from the pre-2000 events, and each thus represents the accrual of a new RICO cause of action. Because Yarr is alleged to have participated in at least some misconduct falling within the limitations period, the court denies his motion to dismiss on the ground that Rao's claims are time-barred.

Finally, the court notes that in his response brief to Yarr, Thomason, and Schumacher, Rao makes new allegations of extortion. For example, he claims that in 2001, Yarr and Thomason threatened him in connection with his attempted purchase of a station in Winnetka, Illinois. Resp. to Yarr, at 5. Because these allegations are not set forth in the complaint, the court will not entertain

---

[7] Yarr argues that the date of the events concerning the downtown stations should be fixed at 1998, not in late 2000 or early 2001, because Rao's complaint states at one point that the events took place in 1998. Pl.'s Am. Compl. ¶ 56. In his response brief, Rao's counsel states that this was due to a "scriveners [sic] error," and that the events actually took place in December 2000 and January of 2001. Resp. to Yarr, at 6. Because of this representation, and because the complaint's allegations are read most reasonably as having occurred in December 2000 and January of 2001, the court accepts the latter time frame for the purposes of this motion. Of course, if subsequent discovery should prove otherwise, Rao's recovery with respect to the downtown stations may well be time-barred.

them in this motion. *See, e.g.*, *Catchings v. City of Chicago*, No. 04 C 6110, 2005 WL 1027127, at *4 (N.D. Ill. Apr. 26, 2005) ("It is axiomatic that a plaintiff cannot raise a new claim for the first time in his response brief.").

**B.    Pleading Requirements**

All of the defendants argue that Rao's RICO claims should be dismissed because they are insufficiently pled. The court agrees.

There is some uncertainty about the pleading standard that should apply to Rao's RICO claims. Courts have held that where RICO claims are based on fraud, Rule 9(b) applies and plaintiffs must state their allegations with particularity. For RICO claims not based on fraud, however, Rule 8(a)'s requirements apply. *See, e.g.*, *Towers Financial Corp. v. Solomon*, 126 F.R.D. 531, 536 (N.D. Ill. 1989) ("Rule 9(b) applies to plaintiffs' RICO claim only to the extent that the claim is based on racketeering acts involving fraud. In all other respects, the liberal notice pleading philosophy of the Federal Rules applies to plaintiffs' RICO claim.").

Rao's complaint alleges both fraud and extortion as the basis for the RICO violations. While the factual basis for the claims appears substantially to overlap, the violations themselves are analytically distinct. The fraud-based RICO allegations fail to comport with Rule 9(b) and must be dismissed. For example, Rao alleges that "Yarr, Thomason, and Schumacher committed numerous acts of mail fraud and wire fraud," Pl.'s Am. Compl. ¶ 20(d), but provides no further elaboration.

Rao's extortion-based claims, however, are not subject to Rule 9(b). *See, e.g.*, *Titan Intern., Inc. v. Becker*, 189 F. Supp. 2d 817, 828 (C.D. Ill. 2001) (defendants' RICO claims alleging extortion as predicate act did not require pleading with particularity); *P & P Marketing, Inc. v. Ditton*, 746 F. Supp. 1354, 1365 (N.D. Ill. 1990) (extortion is not a fraud requiring pleading in compliance with

FRCP Rule 9(b)); *H.G. Gallimore, Inc. v. Abdula*, 652 F. Supp. 437, 451 (N.D. Ill. 1987) (same). Although it is generally unnecessary under Rule 8(a) for plaintiffs to plead each element of their claims, *see, e.g.*, *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("[c]omplaints need not plead law or match facts to every element of a legal theory"), RICO claims by their very nature require a significant level of detail in order to provide defendants with appropriate notice. *See, e.g.*, *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) ("[T]he plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications. *These details are mandated not only by Rule 9(b), but by the very nature of a RICO claim.*") (emphasis added). The Seventh Circuit has held that plaintiffs must plead each of the elements of RICO claims. *See Goren v. New Vision Intern., Inc.,* 156 F.3d 721, 727 (7th Cir. 1998). Nor are plaintiffs permitted simply to allege the elements in "boilerplate fashion." Rather, facts must be pled in support of each element. *Id*. at 727 ("In order to state a viable cause of action under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. It is not enough ... for a plaintiff simply to allege the above elements in boilerplate fashion; instead, she must allege sufficient facts to support each element.") (internal quotations and citations omitted).

The court concludes that Rao's RICO claims are insufficiently pled. First, many elements of the claim are set forth in boilerplate fashion with no factual assertions to back them up. In addition, Rao brings his RICO claims against all of the defendants in a single count of the complaint, and alleges violations of three different RICO subsections in that same count. He fails to provide any time frame for the events in question; and although, drawing all inferences in Rao's favor, some of the necessary details might be gleaned from other counts in the complaint, some of that information

merely compounds the confusion, suffering, by Rao's own admission, from one or more "scrivener's errors." Finally, in his response briefs, Rao indicates a desire to amend his complaint to include additional acts of extortion and to rectify discrepancies regarding dates. Taking all of these circumstances into account, the court does not believe it would be useful to identify the Count I's pleading failures in further detail. The defendants' motions to dismiss Rao's RICO claims are granted.

## II.     FRAUD (COUNT II)

Rao's fraud claim, like his RICO claim, is alleged against each of the defendants. In response, the defendants offer a multitude of overlapping arguments in support of their motions to dismiss the claim. BP argues, for example, that Rao's complaint fails to identify any false statements of material fact, and that it similarly fails to allege a basis for holding BP liable for its employees' misconduct. Both BP and Yarr contend that the fraud claim is time-barred. And all of the defendants urge that the claim fails to comport with Fed. R. Civ. P. 9(b)'s requirement that allegations of fraud be pled with particularity. As was the case with Rao's RICO claims, the court concludes that certain injuries alleged in Rao's fraud claim are time-barred, and that the claim is insufficiently pled.

### A.     Statute of Limitations

When a court exercises supplemental jurisdiction over state law claims, it must apply the forum state's statute of limitations. *See, e.g.*, *Pucci v. Litwin*, 828 F. Supp. 1285, 1299 (N.D. Ill. 1993) ("Like a district court exercising diversity jurisdiction, a district court exercising supplemental jurisdiction applies the law of the state in which it sits . . . . In choosing a statute of limitations, the forum state's statute of limitations applies unless the borrowing statute provides otherwise.") (internal citations omitted). The point at which a cause of action accrues also is determined by state law. *See,*

*e.g.*, *Bowden v. City of Franklin, Kentucky*, 13 Fed. Appx. 266, 274 (6th Cir. 2001) ("[T]he Court must look to state law to determine when the claim for relief accrues when that claim is before a federal court on diversity or supplemental jurisdiction.") (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 752-53 (1980)).  Thus,  Illinois law determines both the statute of limitations that applies to Rao's fraud claims and the point at which the limitations period begins to run.

In Illinois, fraud claims are subject to a five-year statute of limitations, measured from the accrual of the cause of action.  735 ILCS 5/13-205; *see also Clark v. Robert W. Baird Co., Inc.*, 142 F. Supp. 2d 1065, 1074-75 (N.D. Ill. 2001).  The statute of limitations for fraud begins to run at the time the wrong was committed, or the time when the fraud was discovered or could have been discovered through due diligence.  *See, e.g.*, *Asad v. Hartford Life Ins. Co.*, 116 F. Supp. 2d 960, 963 (N.D. Ill. 2000).

BP and Yarr both claim that the statute of limitations bars Rao's fraud claims with respect to the purchase of the Wilmette Station and the loss of his status as franchisee for the Morton Grove Station.  The former act of fraud was alleged to have occurred in 1997, and the latter in March of 1998.  Since Rao's complaint was filed on September 16, 2004, both claims appear time-barred.

As in the case of his RICO claims, however, Rao invokes various tolling doctrines in an attempt to save his fraud claims.  First, he argues that he became aware of the fraud only after contacting the FBI, which apparently occurred in 2003.  Pl.'s Am. Compl. ¶ 79.  Under the so-called "discovery rule," the beginning of the limitations period is postponed from the date when the plaintiff is wronged to the date when he discovers he has been injured.  *See, e.g.*, *Cada*, 920 F.2d at 450.  The discovery rule keeps a claim from accruing until the plaintiff knows, or through reasonable diligence should have known, of the injury.  *See, e.g.*, *In re African-American Slave Descendants Litigation*,

375 F. Supp. 2d 721, 775 (N.D. Ill. 2005).

If Rao had acted with reasonable diligence, he would have become aware of the alleged fraud immediately. Rao claims that he was told, for example, that BP could increase his rent and terminate his leases at any time it wished. Rao could easily have ascertained whether these assertions were true by consulting the relevant documents or seeking legal advice. Moreover, given the alleged extortion and coercion that surrounded both his purchase of the Wilmette Station and his acceptance of the CMA for the Morton Grove Station, it would have been unreasonable for Rao not to have questioned the veracity of the information that Yarr and others gave him.

Similarly, Rao claims that he was deceived about the benefits of switching to a CMA for the Morton Grove Station and about his ability under the agreement to revert back to a franchise relationship at a later time. But if he had read the agreement, he could have determined whether these statements were in fact true. In any case, Rao's claim that he could not have known about the alleged fraud until he met with the FBI cannot be taken seriously. It was precisely the fraudulent and extortionate conduct that led Rao allegedly to seek the FBI's assistance in the first place.

Second, Rao claims that BP's "fraudulent actions involved a continuing, ongoing linked conspiracy and the recent actions relate to those actions, which would otherwise have been time-barred as though all actions were of the most recent in time." Pl.'s Resp. ¶ 19. Although he does not refer to the doctrine by name and cites no authority for the proposition, Rao apparently attempts once again to invoke the "continuing violation doctrine," under which a plaintiff may "obtain relief for a time-barred act of discrimination by linking it with acts that fall within the statutory limitations period. *See, e.g.*, *Filipovic v. K & R Exp. Systems, Inc.*, 176 F.3d 390, 396 (7th Cir. 1999); *see also Heard,* 253 F.3d at 319. As noted above, the continuing violation doctrine applies "only if it would

16

have been unreasonable to expect the plaintiff to sue before the statute ran on th[e] conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations." *Filipovic*, 176 F.3d at 396. Nothing in Rao's complaint suggests that it would have been unreasonable for him to have brought suit immediately after the events alleged with respect to the purchase of the Wilmette Station. On the contrary, the alleged extortionate tactics should have caused him to pursue legal recourse immediately. The same is true with respect to the Morton Grove Station and Rao's apparent surrender of his protections under the PMPA.

The court thus concludes that the statute of limitations bars recovery for all fraudulent activity alleged to have taken place prior to June 16, 1999, including Rao's purchase of the Wilmette Station and the conversion of his agreement with BP for the Morton Grove Station.

**B.      Rule 9(b) Requirements**

All of the defendants argue that Rao fails to plead his fraud claims with the particularity required under Fed. R. Civ. P. 9(b). The court agrees.

Rule 9(b) requires plaintiffs to state "with particularity" any "circumstances constituting fraud." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990). This means the "who, what, when, where, and how: the first paragraph of any newspaper story." *Id*; *see also Zaptron (HK) Ltd. v. Air Sea Transport, Inc.*, 221 F.R.D. 482, 484 (N.D. Ill. 2004) ("Under Fed. R. Civ. P. 9(b), a charge of fraud must be pleaded with particularity. The complaint must allege the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.") (internal quotation omitted).

None of Rao's fraud allegations complies with this standard.[8] With respect to Rao's claim regarding the sale of the downtown stations, for example, the complaint alleges that in October of 2000, he was told by Yarr and Tom Moore (whom Rao identifies as a BP account representative) that BP planned to sell the stations to a land developer and that Rao must vacate the premises. Rao further claims that he was told that he could purchase the land by exercising his right of first refusal, and that if he did not do so, he would lose his leases on other properties. The complaint says nothing, however, about where these alleged statements were made or why the statements in question were false. Rao's claims concerning the surrendering of his protections under the PMPA provide a specific time frame (March of 1998), but again do not specify where the events took place. Finally, Rao's allegations with respect to the sale of the Wilmette Station are deficient: the complaint provides only the year in which the statements were made and says nothing about where or how they were made.

Accordingly, the court must dismiss Rao's fraud claims. The allegations fail to comply with Rule 9(b), and recovery for fraudulent activity alleged to have taken place prior to June 16, 1999 is time-barred. Having dismissed the fraud claims on these grounds, it is unnecessary to address the defendants' other arguments in support of dismissal.

**III.  THE PMPA (COUNT IV)**

In Count IV of his complaint, which is alleged solely against BP, Rao claims that BP violated various provisions of the PMPA. In order to understand Rao's claim, it is important to understand the PMPA's basic framework and purpose.

---

[8] Having found that recovery for injuries relating to pre-1999 fraudulent conduct is time-barred, the court need not address the question of whether Rao's allegations relating to those events are sufficiently pled. The court does note, however, that the pre-1999 allegations are deficient for much the same reasons as the post-1999 allegations.

The PMPA governs franchise arrangements for the sale, consignment, or distribution of motor fuel "in commerce," and protects franchisees from the arbitrary or discriminatory termination or nonrenewal of their motor fuel franchises. *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 855 (7th Cir. 2002). The Act was intended to address the disparity in bargaining power between franchisors and franchisees in the petroleum industry by providing franchisees with certain rights. *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1390 (9th Cir. 1986). Under the PMPA, franchisors who terminate or discontinue a franchise relationship must do so pursuant to one of the grounds enumerated in the Act contained in §§ 2802(b)(2)-(3) or 2803(c), and must meet certain notification requirements contained § 2804. *Dersch Energies*, 314 F.3d at 856. If a franchisor terminates or fails to renew a franchise relationship in accordance with the PMPA, the franchisee can bring a civil suit pursuant to 15 U.S.C. § 2805(a) and/or (b). *Dersch Energies*, 314 F.3d at 856.

Rao claims that in attempting to terminate his leases for the Morton Grove and Franklin Park Stations, BP violated the PMPA in several ways. First, Rao claims that BP failed to provide the 120 days' notice the PMPA requires franchisors to provide when they seek to terminate a lease due to a franchisee's misconduct. Second, Rao claims that BP violated the Act by attempting to terminate his leases in retaliation for his cooperation with the FBI. Finally, Rao claims that under the PMPA, a franchisor may terminate a lease on a property only for misconduct related to that property. Rao argues that any alleged misconduct between him and Yarr was unrelated to the Morton Grove and Franklin Park Stations.

BP contends that Rao's claim under the PMPA (in Count IV) should be dismissed as to the Morton Grove Station because under Rao's contract for that facility, he was a "commission marketer," not a franchisee. Since the PMPA protects only franchisees, BP argues, Rao cannot

invoke the Act's protections in connection with the Morton Grove Station.

BP's argument on this point is put forth in a single paragraph: it claims that in the court's February 17, 2005 ruling with respect to Rao's motion for a TRO, the court found that the Morton Grove Station was not subject to the PMPA. While it is true that the court made such a finding for the purposes of the TRO, that finding, like all findings made in the context of a TRO, is not a final determination. On the contrary, such findings are provisional: they are made solely to maintain the status quo and to prevent a party from suffering irreparable injury until a full hearing on the merits can be held. *See, e.g.*, *Loewen Group Intern., Inc. v. Haberichter*, No. 93 C 7377, 1998 WL 603040, at *1-2 (N.D. Ill. Sept. 4, 1998) ("The findings and conclusions for a preliminary injunction are, by their nature, preliminary."); *Bloomington Partners, LLC v. City of Bloomington*, No. 04-CV-2287, 2005 WL 3536340, at *5 (C.D. Ill. Dec. 23, 2005) (court's ruling on motion for a temporary restraining order and preliminary injunction was not a final determination on the merits of any claims). BP's reliance on the findings made in the temporary restraining order is misplaced.

In a footnote, BP cites a number of cases from other circuits in support of its contention that the PMPA does not protect commission marketers. But its treatment of the issue is much too facile. BP cites § 2802 of the statute in support of its contention that the PMPA protects only franchisees. But while that provision outlines the PMPA's general prohibition against the termination or nonrenewal of franchise relationships, it does not define the term "franchise." Rather, the definition is provided in § 2801, which in turn contains multiple subsections that elaborate on and qualify the term's meaning. Nor does Rao's response sufficiently engage the issue. His entire argument consists of the assertion that "it is plaintiff's position that indeed, PMPA does apply to Morton Grove, that a jury will agree and that PMPA will be applied to Morton Grove." Pl.'s Resp. ¶ 18(b). In light of

§ 2801's complexity, the court requires more thorough exploration of this issue by the parties before making a definitive ruling as to whether the Morton Grove Station is subject to the PMPA. At this stage of the litigation, therefore, the court declines to dismiss Count IV's PMPA claim insofar as it relates to the Morton Grove Station.

## IV.    BREACH OF CONTRACT (COUNT V)

In Count V, which is brought solely against BP, Rao claims that BP's attempt to terminate Rao's leases for the Franklin Park and Morton Grove Stations amounts to a breach of contract. BP argues that Rao's breach of contract claim must be dismissed as to the Franklin Park Station because it is preempted by the PMPA.[9]   The court agrees.

Section 2806(a)(1) of the PMPA provides:

> To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C.A. § 2806(a)(1).

Thus, § 2806 preempts state statutes that purport expressly to regulate petroleum franchisor-franchisee relationships as well as common law doctrines that apply to such relationships. *See Huth v. B.P. Oil, Inc.*, 555 F. Supp. 191, 194 (D. Md. 1983). There is some disagreement as to how broadly to interpret the PMPA's preemption provision. *See Seckler v. Star Enterprise*, 124 F.3d

---

[9] Consistent with its position that the Morton Grove Station is covered by a CMA and that the PMPA does not apply to such agreements, BP does not seek to dismiss the breach of contract claim insofar as it applies to the Morton Grove Station.

1399, 1404 (11th Cir. 1997) ("The Fourth and Eighth Circuits have adopted an expansive view of PMPA preemption, holding that the PMPA preempts any state law that affects the termination of franchises or nonrenewal of franchise relationships. The First, Second, Third, Sixth and Ninth Circuits have instead adopted a restrictive preemption view which holds that the PMPA preempts only those state laws that purport to regulate the grounds for, procedures for, and notification requirements of terminations of franchises and nonrenewals of franchise relationships.") (internal citations and quotations omitted).

Although the Seventh Circuit has not specifically spoken on the issue, Rao's claim is preempted under either the limited or the expansive reading of PMPA preemption. The contractual provision Rao cites as the basis for Count V relates specifically to the conditions under which the lease agreement for the Franklin Park Station permitted termination. Accordingly, Count V's breach of contract claim with respect to the Franklin Park Station is dismissed. *See, e.g.*, *Chevron, U.S.A., Inc. v. Mebtahi*, 148 F. Supp. 2d 1019, 1028 (C.D. Cal. 2000) (PMPA preempted breach of contract claim based upon the same facts, and seeking the same relief, as claim under the PMPA); *Clark v. BP Oil Co.*, 930 F. Supp. 1196, 1202 (E.D. Tenn. 1996) (breach of contract claim preempted to the extent that it arose out of the alleged termination or nonrenewal of franchise).

## CONCLUSION

The court summarizes its holdings as follows: Count I (RICO) is dismissed because it is insufficiently pled. In addition, recovery for injuries alleged to have occurred prior to September 16, 2000 is time-barred. Count II (fraud) is dismissed because the claim is not pled with sufficient particularity. Recovery for injuries relating to pre-1999 fraudulent activity is also time-barred. Count III (coercion and extortion) was dismissed pursuant to the court's order of August 4, 2005 because

no such cause (or causes) of action exist under Illinois law. Count IV (BP's violation of the PMPA) remains intact, with respect both to the Franklin Park Station and to the Morton Grove Station. Finally, Count V (breach of contract) is dismissed as to the Franklin Park Station because it is preempted by the PMPA.

What remains, therefore, is Rao's PMPA claim (as to both the Morton Grove and Franklin Park Stations) and his breach of contract claim (as against the Morton Grove Station). Since BP is the only defendant named in these claims, all claims against Yarr, Thomason, and Schumacher are dismissed.


ENTER:

/s/_____
JOAN B. GOTTSCHALL
United States District Judge


DATED: February 24, 2006