# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SALIK RAO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04 C 6040 |
| | ) | |
| BP PRODUCTS NORTH AMERICA, INC., | ) | Judge Joan B. Gottschall |
| AMOCO, INC., STEVE YARR, PAIGE | ) | |
| THOMASON (A/K/A PAIGE SCHUMACHER), | ) | Magistrate Judge Denlow |
| BRAD SCHUMACHER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Salik Rao ("Rao") has sued BP Products North America, Inc. ("BP") for violation of the Petroleum Marketing Practices Act ("PMPA" or "the Act"), 15 U.S.C. §§ 2801 *et seq.*, and for breach of contract. BP has moved for summary judgment as to both claims. For the reasons set forth below, the motion is granted.

## BACKGROUND

Rao filed the instant lawsuit on September 16, 2004. The complaint alleged that Rao, who for several years has owned and/or operated BP gasoline stations in Chicago and the surrounding area, was the victim of an extortion scheme by BP and certain of its employees. Rao claimed that Steve Yarr ("Yarr"), a BP regional area manager, and Paige Thomason ("Thomason"), a BP retail account executive, along with a number of other BP officials and employees, threatened him with the loss of his leases and franchise operations unless he agreed to various demands. For example, Rao claimed that he was allowed to purchase certain BP stations only on the condition that he accept Yarr and Thomason as silent partners. He also alleged that Yarr demanded gifts from him in the form of cash, computer equipment, and home appliances. Rao claimed that he was told that if he

refused, he would be falsely cited for violations of his franchise agreements, thus placing his relationship with BP in jeopardy.

BP conducted an investigation into Rao's allegations and concluded that the relationship between Rao and Yarr was mutually beneficial and that Rao had been engaged in bribery and influence peddling. In July 2004, BP terminated its agreements with Rao for gas stations that he owned and/or operated in Franklin Park and Morton Grove, Illinois. Rao subsequently filed suit against BP, Yarr, and Thomason, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (Count I), as well as fraud (Count II), coercion and extortion (Count III), violation of the PMPA (Count IV), and breach of contract (Count V). Rao also sought a preliminary injunction to prevent BP from terminating his agreements for the Franklin Park and Morton Grove Stations.

On February 24, 2006, the court dismissed all of Rao's causes of action except for his PMPA and breach of contract claims, leaving BP as the only remaining defendant. *Rao v. BP Prods. North Am.*, No. 04 C 6040 (N.D. Ill. Feb. 24, 2006) ("*Rao I*"). In June 2005, Magistrate Judge Morton Denlow held a four-day hearing on the preliminary injunction motion and issued a Report and Recommendation ("R&R") recommending that the motion be denied. In a March 9, 2006 opinion, the court adopted Judge Denlow's R&R and denied Rao's motion for a preliminary injunction. *Rao v. BP Prods. North Am.*, No. 04 C 6040 (N.D. Ill. Mar. 9, 2006) ("*Rao II*"). BP now moves for summary judgment.

## DISCUSSION

A.  **Legal Standard**

   1.  **Federal Rule of Civil Procedure 56**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party shows that there is no genuine issue of material fact, the burden of proof shifts to the nonmoving party to designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts demonstrating the existence of a genuine issue for trial. *See, e.g.*, *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). "A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion." *Id.* at 932 (internal quotations and citations omitted).

   2.  **Northern District of Illinois Local Rule 56.1**

Along with Federal Rule 56, Northern District of Illinois Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts in the form of short numbered paragraphs supported by specific references to the factual record. U.S. Dist. Ct. Rules N.D. Ill., Local Rule 56.1(a)(3). Local Rule 56.1 also requires the nonmoving party to submit a response to each paragraph in the moving party's Rule 56.1 statement. Where a nonmovant disagrees with a

particular paragraph, his response must support the disagreement with specific references to the factual record. U.S. Dist. Ct. Rules N.D. Ill., Local Rule 56.1(b)(3). Rao has utterly failed to comply with Local Rule 56.1(b)(3), filing no response to BP's Rule 56.1(a) Statement of Material Facts.[1] Instead, Rao has filed only a routine response brief (which, amounting to a mere seven

---

[1] In passing, Rao appears to offer what might be regarded as an attempt to excuse his failure to cite any evidence in his support. Specifically, he argues:

> Amoco continues to offer matters that were raised before Judge Denlow, none of which are controlling in this case. The proceeding before Magistrate Denlow was for injunctive relief. The entire case was not presented and Magistrate Denlow denied Rao the right to call at least one critical witness, Lisa Freemen [sic], Amoco's in house counsel, and further, when that proceeding was heard there had been no opportunity to conduct any discovery, thus the evidence which Rao knows to be in existence was not available.

Pl.'s Resp. in Opp. to Def.'s Mot. Summ. J. at 2.

None of these assertions makes Rao's failure to comply with Rule 56.1 any more acceptable. The fact that the entire case was not presented before Judge Denlow does not mean that the evidence BP cites from the preliminary injunction hearing is defective; nor does it absolve Rao of the obligation to oppose BP's motion for summary judgment by adducing evidence in support of his case; nor again does the fact that discovery had not be taken prior to the preliminary injunction hearing explain why Rao has failed even now, more than a year later, to cite any specific evidence in support of his claims. Indeed, as BP rightly points out, if Rao believed more discovery was necessary before responding to BP's motion for summary judgment, he was required to file an affidavit to that effect pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. *See, e.g.*, *Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 648 (7th Cir. 2006) ("Rule 56(f) requires a party to state the reasons why it cannot adequately respond to the summary judgment motion without further discovery and must support those reasons by affidavit."); *Theotokatos v. Sara Lee Personal Products*, 971 F. Supp. 332, 343 (N.D. Ill. 1997) ("A party invoking Federal Rule 56(f) must do so in good faith by affirmatively demonstrating why he cannot respond to a movant's affidavits . . . and how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact. The party opposing summary judgment must make his request for additional discovery in the form of an affidavit and show that additional relevant evidence exists. Specific assertions which could produce a genuine issue of material fact, not mere speculation, are required.") (internal quotations and citations omitted). Rao never filed a Rule 56(f) affidavit.

pages, is itself radically deficient). Local Rule 56.1(b) unequivocally states that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." U.S. Dist. Ct. Rules N.D. Ill., Local Rule 56.1(b)(3)(C). The Seventh Circuit has consistently emphasized the importance of this sanction for failure to comply with Rule 56.1(b):

> We have endorsed the exacting obligation these rules impose on a party contesting summary judgment to highlight which factual averments are in conflict as well as what record evidence there is to confirm the dispute, explaining that district courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions. We have also repeatedly upheld the strict enforcement of these rules, sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts.

*Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994) (citations omitted).

---

Similarly, Rao's claim that he was not allowed to call Lisa Freeman at the preliminary injunction hearing is frivolous. Indeed, the court expressly rejected the same claim in ruling on Rao's preliminary injunction motion. *See Rao II*, No. 04 C 6040, slip op. at 19. Specifically, the court noted there that Rao had failed to cite anything in the record indicating his attempt to call Freeman as a witness. The court also observed that Rao had cited no place in the record indicating Judge Denlow's refusal to allow Freeman to appear, nor any place indicating his objection to Freeman's alleged exclusion. *Id.* In short, Rao has given the court no reason to overlook his failure to comply with Local Rule 56.1.

The closest Rao comes to offering a specific challenge to any of BP's statements of material fact can be found in a section at the end of Rao's response brief under the heading "BP Amoco's Motion for Summary Judgment Is a Motion Lacking Good Faith and Deserves Sanctions." Pl.'s Resp. in Opp. to Def.'s Mot. Summ. J. at 4. The section consists of four paragraphs purporting to show that "Amoco counsel deliberately made multiple false, mendacious statements in their motion." *Id.* Clearly, this cannot serve as a substitute for a proper response to BP's Rule 56.1 statement; and even if it could, it would not help Rao, for here, too, he fails to cite any specific evidence in support of his contentions. In any event, it goes without saying that Rao's apparent request for sanctions is frivolous: not only is the conduct alleged not sanctionable, but Rao's request fails to comply with Rule 11, which requires that requests for sanctions "be made separately from other motions or requests." Fed. R. Civ. P. 11(c)(1)(A).

Because Rao has failed to comply with Local Rule 56.1, the court accepts as true all of the facts set forth in BP's statement of undisputed facts.[2]  Although this generally results in summary judgment for the moving party, *see, e.g.*, *Dixon v. Illinois State Bd of Educ.*, No. 04 C 1630, 2005 WL 2387686, at *1 (N.D. Ill. Sept. 23, 2005) ("Essentially, the penalty for failing to properly respond to a movant's 56.1(a) statement is usually summary judgment for the movant . . . because the movant's factual allegations are deemed admitted.") (quoting *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000)), the court nevertheless conducts a thorough inquiry in what follows to ensure that BP has discharged its initial burden under Federal Rule 56.

B.      **Count IV: The Petroleum Marketing Practices Act**

The court first considers BP's motion for summary judgment as to Rao's PMPA claim.  The PMPA was "intended to protect gas station franchise owners from arbitrary termination or nonrenewal of their franchises with large oil corporations and gasoline distributors, and to remedy the disparity in bargaining power between parties to gasoline franchise contracts." *DuFresne's Auto*

---

[2] There is some disagreement among courts in this circuit as to whether, when a nonmoving party fails to comply with Local Rule 56.1, the court must still view the facts in the light most favorable to the nonmoving party. *Compare Ballentine v. Illinois State Police*, No. 02 C 5900, 2004 WL 1638226, at *1 n.1 (N.D. Ill. July 21, 2004) ("Since Ballentine did not comply with Local Rule 56.1 and file a proper response to ISP's statement of undisputed facts, the court accepts as true all facts set forth in ISP's Local Rule 56.1 statement.  The court still must view the facts in the light most favorable to Ballentine, the non-moving party.") and *Taylor v. City of Chicago*, No. 01 C 2057, 2003 WL 22282386, at *3 (N.D. Ill. Sept. 30, 2003) (same) *with Fink v. Winnebago County Sheriff, Correction Medical Services, Inc.*, No. 99 C 50090, 2002 WL 221603, at *3 n.2 (N.D. Ill. Feb. 12, 2002) ("Where, as here, the nonmoving party's response to the moving parties' statements of fact has been stricken because of noncompliance with LR 56.1, the court departs from its usual posture of construing all facts in favor of the nonmoving party.") and *Diggs v. Dynegy, Inc.*, No. 03 C 3223, 2003 WL 22794558, at *1 (N.D. Ill. Nov. 24, 2003) (same).  In this case, the disagreement is largely academic, since summary judgment in BP's favor is appropriate regardless of whether BP's statement of the facts is viewed in the light most favorable to Rao.

*Service, Inc. v. Shell Oil Co.*, 992 F.2d 920, 925 (9th Cir. 1993). Franchisors who seek to terminate a relationship with a franchisee must do so in conformity with one of the grounds enumerated in sections 2802(b)(2)-(3) and 2803(c) of the Act. *See, e.g.*, *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 856 (7th Cir. 2002). The PMPA also requires franchisors to meet certain notification requirements when they seek to terminate franchise agreements. *Id.* For example, when a franchisor seeks to terminate a franchise agreement as a result of a franchisee's misconduct, the Act requires the franchisor to give the franchisee notice of the termination within 120 days from the date on which the franchisor first acquires actual or constructive knowledge of the franchisee's misconduct. *See* 15 U.S.C. § 2802(b)(2)(A)(i), & (b)(2)(C)(i). If a franchisor terminates or fails to renew a franchise relationship in violation of the PMPA, the franchisee can bring a civil suit pursuant to 15 U.S.C. § 2805(a) and/or (b). *Dersch Energies*, 314 F.3d at 856.

### 1. The Franklin Park Station

BP argues that its termination of Rao's Franklin Park franchise agreement was warranted under two separate provisions of the PMPA. The first is section 2802(b)(2)(A), which allows for termination as a result of a franchisee's failure to "comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A). BP notes that its Dealer Lease and Supply Agreement with Rao for the Franklin Park Station allows for termination upon "[c]ommission by Dealer or any of Dealer's employees or agents of any deceptive, fraudulent, illegal, immoral, or other improper act relevant to the operation of the business on the Facility which is detrimental to Lessor." BP contends that the latter provision is reasonable and of material significance to the franchise relationship, and that Rao's bribery and other fraudulent activity constituted a breach of the provision. Consequently, BP argues, the

termination of Franklin Park franchise agreement was fully justified under the PMPA.

Secondly, BP argues that Rao's termination was justified under section 2802(b)(2)(C), which allows for termination due to the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable." 15 U.S.C. § 2802(b)(2)(C). The PMPA itself specifically mentions "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises" as an example of an event whose occurrence justifies termination under section 2802(b)(2)(C). *See* 15 U.S.C. § 2802(c)(1). Again, therefore, BP claims that it acted in conformity with the PMPA by terminating Rao's agreement for the Franklin Park Station on the basis of his bribery and fraudulent conduct.

The court agrees that Rao's termination was justified under either of the PMPA provisions it has invoked. First, it is undisputed that Rao engaged in fraudulent activity in connection with the Franklin Park Station. In particular, the uncontested facts show that from roughly 1993 to 2003, Rao met with Yarr and paid him about $100,000 in cash and gifts in order to obtain favorable treatment with respect to his BP interests, including those pertaining to the Morton Grove and Franklin Park Stations. Def.'s 56.1 Stmt. ¶ 25; *see also Portaluppi v. Shell Oil Co.*, 684 F. Supp. 900, 905 (E.D. Va. 1988) (franchisee's cocaine use was an event relevant to the franchise relationship that warranted termination under PMPA). Although Rao claims that he was the victim of extortion, BP concluded that Rao's gifts were part of a "two-way arrangement" by which Rao attempted to influence decisions in his favor by bribing Yarr.[3] *Id.* ¶¶ 27, 59. And while Rao claimed that he felt

---

[3] It is well-settled that it is improper to assert legal and other conclusions in a Rule 56.1 statement. *See, e.g.*, *Zeidler v. A & W Resaurants, Inc.*, No. 03 C 5063, 2006 WL 1898056, at *3 (N.D. Ill. July 6, 2006) ("Local Rule 56.1 for the Northern District of Illinois requires that the parties support all facts with specific references to the record and further emphasizes that it is inappropriate to include legal conclusions and/or argument in the Rule 56.1 statements of

pressured to bribe Yarr, he conceded to BP investigators that he derived financial benefit from the arrangement and that he was aware that his gifts to Yarr were improper. *Id*. ¶¶ 27, 30, 61; Benhart Decl.¶ 5, Def.'s Ex. 10. For example, through his gifts and payments to Yarr, Rao obtained an interest in two BP stations in downtown Chicago. *Id.* ¶ 36. At first, Rao operated the stations, earning more than $10,000 per month from each. *Id.* ¶ 37. Later, Yarr enabled Rao to purchase the stations at a favorable price. *Id*. ¶ 38. When Rao and his partner sold one of the properties about eighteen months later, they earned a profit of $1,150,000. *Id.* ¶¶ 38, 42.

Second, it is undisputed that Rao's conduct constitutes fraud and criminal misconduct under Illinois law. As an initial matter, the court notes that Rao makes no attempt in his response brief to dispute whether his conduct as alleged by BP may be characterized as fraud or criminal misconduct. As a result, Rao has waived any argument on this point. *See, e.g.*, *Knowles v. United Healthcare*

---

facts."); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("It is inappropriate to allege legal conclusions in a 56.1(a) statement on the off-chance that one's opponent might not file a correct response."). BP's citation to conclusions arrived at as a result of its investigation of Rao, however, do not fall into that category. Witnesses may testify to conclusions that they have inferred from underlying facts. *See Fenje v. Feld*, 301 F. Supp. 2d 781, 813-14 (N.D. Ill. 2003)(citing Fed. R. Evid. 701, 704(a)). In addition, a summary judgment affidavit may include inferences and opinions so long as they are based on underlying facts of which the affiant has personal knowledge, *id.* (citing *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)), and a "Rule 56.1 statement itself certainly may include the ultimate factual determinations to be made by the trier of fact" so long as they are "sufficiently supported by the cited evidence or related evidence upon which it relies." *Id.* Here, anything that might be regarded as a conclusion in BP's Rule 56.1 statement is amply supported by citations to admissible evidence. With respect to Rao's relationship with Yarr, for example, BP found that, unlike a relationship based on extortion, Rao was able to "negotiate" the amounts of gifts he paid to Yarr and frequently refused to provide certain kinds of gifts to Yarr without suffering any reprisals. Def.'s 56.1 Stmt. ¶ 59. Rao introduced his cousin to Yarr when his cousin expressed an interest in purchasing a BP station in Lockport, Illinois, *id*. ¶ 54, a step that would have made little sense if Yarr had been extorting gifts from Rao all along without providing him with any benefits in return. The fact that Rao neglected to inform BP of his dealings with Yarr for five years, *id.* ¶ 32, further indicates that Rao was benefitting from the relationship and wished to keep it secret.

*Services, Inc.*, No. 05 C 1613, 2006 WL 1430212, at *11 (N.D. Ill. May 19, 2006) (plaintiff waived arguments by failing to raise them in response brief opposing summary judgment). The waiver issue aside, BP has shown that Rao engaged in fraud. It is undisputed, for example, that Rao took on Thomason as a silent partner for a station in Wilmette, Illinois, and that the two artificially inflated the sale price for the station in an attempt to discourage BP from purchasing it. Def.'s 56.1 Stmt. ¶ 49. Rao's activities with Thomason satisfy each of the elements of fraud identified by Illinois courts: (1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance. *See, e.g.*, *State Sec. Ins. Co. v. Frank B. Hall & Co.*, 630 N.E.2d 940, 943 (Ill. App. Ct. 1994).

Similarly, the relationship between Rao and Yarr is a paradigmatic example of commercial bribery. Under Illinois law, the criminal offense of commercial bribery is committed when a person "confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." 720 ILCS 5/29A-1. It is undisputed that Rao's payments to Yarr were designed to influence Yarr's decisions in favor of Rao and Rao's BP interests.[4]

---

[4] In failing to file a Rule 56.1(b)(3)(C) Statement of Additional Facts, Rao has provided the court with no evidence to support his contention that he was a victim of extortion as opposed to a willing participant in a bribery and fraud scheme. Even if Rao were able to produce evidence of extortion, however, his termination would still have been proper under the PMPA, for extortion is not generally a defense to bribery. *See, e.g.*, *City of Chicago Heights v. Lobue*, No. 92-7410, 1995 WL 290389, at *6 (N.D. Ill. May 10, 1995) ("[U]nder Illinois law as interpreted by the Seventh Circuit, if a person pays bribes in hope of influencing a governmental decision that is discretionary in nature, extortion can never be a defense to a claim of bribery. Second, where a non-discretionary decision is involved, the extortion defense is available, if at

Finally, it is undisputed that Rao's payments to Yarr were part of an overall plan intended to protect *all* of Rao's BP interests, including his interest in the Franklin Park Station. Def.'s 56.1 Stmt. ¶ 34. Hence, Rao's fraud and bribery meets the requirement under section 2802(b)(2)(A) that the misconduct be "relevant to the operation of the business on the Facility" in question, and section 2802(b)(2)(C)'s requirement that the misconduct be "relevant to the operation of the marketing premises." Since such conduct constitutes proper grounds for termination under either section 2802(b)(2)(A) or section 2802(b)(2)(C) of the PMPA, the court concludes that BP did not violate the Act in terminating Rao's franchise agreement for the Franklin Park Station.

Rao attempts to escape this conclusion by arguing that BP's termination violated the PMPA's notice provisions. In particular, Rao argues that BP was aware of Rao's misconduct by November 2003 but did not terminate the agreement until July 14, 2004, thus failing to take action within the

---

all, only in restricted circumstances defined by an absence of reasonable legal alternatives to bribery, limited involvement in the bribery itself and in the scheme surrounding the bribery, and a lack of benefit from those activities."). The same is true with respect to fraud. *See, e.g.*, *United States v. Lee Stoller Enterprises, Inc*, 652 F.2d 1313, 1320 (7th Cir. 1981) (rejecting extortion defense to fraud charges on the ground that the defendant profited from his participation in the scheme); *United States. v. George*, 477 F.2d 508, 514-15 (7th Cir. 1973) (rejecting extortion defense to mail fraud charges on the ground that the defendant could have reported to employer that its agent had asked him for kickbacks.).

  Moreover, even if Rao's conduct somehow fell short of the technical definition of fraud, bribery, or some other form of criminal conduct, thus leaving doubt as to whether his termination was proper under section 2802(b)(2)(C), his activity was clearly "deceptive, immoral, or improper," thus constituting a violation of the Franklin Park Dealer Lease and Supply Agreement. Since Rao's termination was justified on the latter ground, and since a franchisor need establish only one ground for termination, s*ee Thompson v. Amoco Oil Co.*, 903 F.2d 1118 (7th Cir. 1990) (district court need consider only one of the franchisor's asserted grounds for termination on remand since the PMPA requires only one valid justification); *see also Chevron U.S.A. Inc. v. SSD & Associates*, No. C 05-03276 WHA, 2006 WL 2619357, at *9 n.5 (N.D. Cal. Sept. 12, 2006) (collecting cases sustaining terminations where the franchisor proves only one of several asserted grounds for termination), establishing that Rao engaged in criminal misconduct ultimately is not essential.

120 days allotted under the Act. The court disagrees. Rao first informed BP of his dealings with Yarr in the summer of 2003. Def.'s 56.1 Stmt. ¶ 57. At that time, Rao told Yarr's supervisor, BP Vice President Oliver Shackelford, that Yarr had been extorting money and gifts from him. *Id.* BP subsequently initiated an investigation led by Ronald Benhart ("Benhart"), a BP Regional Security Advisor. *Id.* At first, Rao aided BP with the investigation. In November 2003, for example, Rao assisted BP and the FBI in conducting a sting operation that resulted in Yarr's arrest. *Id.* ¶ 58. When interviewed by Benhart, however, Yarr claimed that he had been "assisting" Rao and other BP dealers "in facilitating transactions in exchange for the money and the gifts." *Id.* ¶ 64. Hence, BP continued to investigate the nature of Rao's relationship with Yarr after November 2003. *Id*. ¶ 65. By June 2004, however, Rao had ceased cooperating with BP. *Id.* ¶ 66. It was only at that time that BP realized that it was unlikely to obtain any further information concerning the matter and thus made the decision to terminate him. *Id.* ¶ 67.[5] According to this account, which the court takes as undisputed, BP first had knowledge of Rao's bribery only in June 2004. Benhart Decl. ¶ 27. Having terminated the Franklin Park agreement by July 2004, BP's actions were well within the PMPA's 120-day window.

---

[5] It is important to note that "mere suspicions . . . do not provide a franchisor with a basis for termination despite section 2802's contemplation of 'constructive knowledge.'" *Nassau Blvd. Shell Service Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 362-63 (2d Cir. 1989). On the contrary, in "passing the PMPA, Congress intended to promote, if not mandate, [a] careful approach to termination by franchisors." *Id.* In waiting to terminate Rao until he refused to cooperate any further, BP was exercising the kind of "discretion, restraint, and prudence [that] goes a long way toward the prevention of arbitrary terminations by eliminating terminations based on idle rumors and baseless allegations." *Id.*

Rao gestures at two further arguments in opposition to summary judgment, neither of which has any merit. His contentions, set forth in a single paragraph, are as follows:

> Rao also argues (Complaint, par. 94, et. seq.), that BP's actions are retaliatory, and further that any termination must be based on infractions which relate to the premises being terminated, and that even assuming *arrguendo* [sic], that Rao did act improperly (which he denies), the allegations against him did not relate to either of the stations in issue before this court. This is also a fact issue and must go to a jury.

Pl.'s Resp. in Opp. to Def.'s Mot. Summ. J. at 3.

Rao's passing allusion to retaliation on BP's part is just that – a passing allusion – and has not been sufficiently developed to warrant the court's attention. Also without merit is Rao's half-hearted argument that BP violated the PMPA because the conduct for which he was terminated was not related to the premises in question. The court rejected the latter argument in ruling on Rao's motion for a preliminary injunction. *Rao I*, No. 04 C 6040, slip op. at 13. There, Rao had claimed that his termination was impermissible under the PMPA because his fraudulent conduct was not alleged to have taken place on the premises of the Franklin Park Station. The court noted the lack of any authority for Rao's notion that conduct cannot be "related to" a facility without occurring on the premises of that facility. *Id.* The current incarnation of Rao's argument is even more plainly without merit. Indeed, Rao here fails to provide *any reason* whatsoever in support of his claim that his conduct was unrelated to the stations in question. In sum, in light of the foregoing considerations, the court concludes that BP's termination of the Franklin Park franchise was in conformity with the PMPA.

### 2. The Morton Grove Station

The court next considers whether BP violated the PMPA in terminating its agreement with Rao for the Morton Grove Station. As a threshold matter, BP denies that the PMPA applies to the

Morton Grove Station, arguing that Rao operated the station pursuant to a "commission marketer agreement" instead of a franchise agreement.[6] Since the PMPA applies only to franchisees, BP argues, the Act is simply irrelevant to the Morton Grove site.

Rao advances a number of arguments in support of his contention that his agreement for the Morton Grove Station is indeed protected by the PMPA. The issue need not be resolved here, however, for Rao's PMPA claim fails as to the Morton Grove Station in any event: if Rao is a commission marketer with respect to the station, he cannot invoke the PMPA; on the other hand, as the court already noted in denying Rao's preliminary injunction motion, if the PMPA applies, the Morton Grove termination was proper on account of Rao's misconduct. *Rao II*, No. 04 C 6040, slip op. at 15. Rao's termination at Morton Grove, like that at Franklin Park, was based on Rao's bribery and other fraudulent activities. Having concluded that Rao's conduct warranted termination with respect to the Franklin Park Station, it follows *a fortiori* that the Morton Grove termination was also warranted. Hence, the court grants BP's motion for summary judgment as to Rao's PMPA claim in Count IV.

C.   **Count V: Breach of Contract**

The court next considers BP's motion for summary judgment with respect to Rao's claim for breach of contract. In its February 22, 2006 order, the court dismissed Rao's breach of contract claim as to the Franklin Park Station on the ground that the claim was preempted by the PMPA. *Rao*

---

[6] Judge Denlow's Report and Recommendation contains a thorough discussion of the differences between franchise agreements and commission marketer agreements. *See* R&R at 5-6. In brief, under a commission marketer agreement, the dealer does not buy or take title to the gasoline sold at the station. BP sets gasoline prices and bears the risk of price volatility while the dealer receives a guaranteed margin. BP also pays all real estate taxes, maintenance costs, licensing fees, etc.

*I*, No. 04 C 6040, slip op. at 21. The same result obviously follows with respect to the Morton Grove Station if it, too, is covered by the PMPA. Hence, the sole question before the court with respect to Count V is whether, assuming that the parties' agreement with respect to the Morton Grove Station is *not* governed by the PMPA, BP's termination of the agreement constituted a breach.

BP's argument is simple: the parties' Morton Grove agreement expressly allows BP to terminate the contract immediately where the station operator has engaged in misconduct. In particular, paragraph 23(B)(3) of the contract states that "BP may terminate this Agreement immediately upon written notice" for "[f]raud or criminal misconduct by the Marketer or Marketer's employees relevant to the operation of the Facility." Morton Grove Agreement ¶ 23(B)(3). As already demonstrated, it is undisputed that Rao engaged in bribery and other fraudulent activity. Hence, BP argues, its decision to terminate Rao was acceptable under the contract.[7]

Rao does not even come close to providing a response to BP's argument. Indeed, he devotes a mere two paragraphs of his opposition brief to defending his breach of contract claim. The first simply reiterates contentions contained in his complaint and declares that these present disputed

---

[7] The court notes that paragraph 23 of the Morton Grove agreement requires that the fraud or criminal misconduct must be "relevant to the operation of the Facility." Morton Grove Agreement ¶ 23(b)(3). BP's termination letter to Rao did not mention misconduct specifically related to the Morton Grove Station. Nevertheless, the court concludes that the conduct for which Rao was terminated was relevant to the operation of the Morton Grove Station and thus was in conformity with the contract. As noted above, in his preliminary injunction motion, Rao disputed whether the conduct in question was relevant to the Morton Grove Station. His argument was rejected by Judge Denlow (and by this court) based on the finding that Rao's bribery and other conduct was intended to benefit his position with respect to *all* of his stations. *See* R&R at 35. Rao has not raised the challenge again in connection with the instant motion; and indeed, having failed to respond to BP's Rule 56.1 statement, the court accepts as undisputed BP's assertion that gifts by Rao to Yarr were intended to protect *all* of Rao's BP stations, including those at Franklin Park and Morton Grove. Def.'s 56.1 Stmt. ¶ 34. In short, the court concludes not only that Rao engaged in a kind of conduct warranting termination under the contract but also that Rao's conduct was relevant to the operation of the Morton Grove Station.

issues of fact. In its entirety, the paragraph states:

> Rao alleges BP's actions to be retaliatory and not in accordance with either contract or franchise or commission marketing agreements. Rao also states that (para. 119 et seq.), BP deliberately interfered with prospective sales of Rao's stations as BP sought to punish Rao for cooperating with the FBI, and that BP's failure to allow a sale of his stations to proceed was a violation of the contracts and agreements between Rao and BP. These issues are all factual in nature, they have not been ruled on by any tribunal with the force that said issues are *res judicata*, and in fact these matters must be presented to a jury.

Pl.'s Resp. in Opp. to Def.'s Mot. Summ. J. at 4. It hardly needs mentioning that a party cannot defeat a motion for summary judgment by resting on its pleadings. *See, e.g.*, *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 795 (7th Cir. 1999) ("The non-moving party may not rest only upon the allegations set forth in the pleadings, but must come forward with specific facts sufficient to raise a genuine issue for trial.").

Rao goes on to assert that summary judgment is inappropriate because determining whether Rao was committing bribery or being extorted is a question of fact requiring the assessment of witnesses' demeanor and credibility. This argument is without merit. First, as the Seventh Circuit has repeatedly affirmed, a motion for summary judgment cannot be denied on the ground that a witness' credibility might be impeached at trial. *See, e.g.*, *Parker v. Federal Nat. Mortg. Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984) ("[A] plaintiff should not be allowed to proceed with a case on the mere hope that trial would produce the evidence he was unable to garner at the stage of summary judgment."); *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1224 (7th Cir. 1980) (plaintiff should not be allowed to survive summary judgment based "on the hope that he will be able to develop evidence on cross-examination of his opponent's witnesses"); s*ee also Outlaw v. Newkirk*, 259 F.3d 833, 841 (7th Cir. 2001) (standing alone, the mere prospect of challenging a witness's credibility is not enough to avoid summary judgment); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d

398, 406 (7th Cir. 1998) (same). Rather, Rao must point to *specific evidence* suggesting that BP's account of Rao's conduct is not credible. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997); *Tan v. City of Chicago*, No. 00 C 1470, 2001 WL 1012586, at *5 (N.D. Ill. Aug. 30, 2001)("[C]onclusory statements that aim to undermine the moving party's evidence – e.g., by attacking the credibility of the moving party's witnesses – are insufficient to defeat a motion for summary judgment. . . . Questions for a jury . . . are not so easily created. [The nonmoving party] would need to present specific evidence on the issue to create a dispute on credibility."). As the Seventh Circuit has made clear, if "the evidence does not amply support plaintiff's claim that the defendant's explanation is unworthy of credence, judgment as a matter of law is entirely appropriate." *Futrell v. J.I. Case*, 38 F.3d 342, 346 (7th Cir. 1994). Here, Rao has failed to offer even a scintilla of evidence suggesting that BP's account is not credible. Moreover, as noted above, *see supra* note 4, even if Rao could show that he had ben extorted, his conduct still would amount to fraud and bribery under Illinois law. Hence, summary judgment is proper with respect to Rao's breach of contract claim.

## CONCLUSION

For the foregoing reasons, BP's motion for summary judgment is granted.

ENTER:

\_\_/s/_____
Joan B. Gottschall
United States District Judge

Dated: January 19, 2007